William K. Nelson SB#279450
Counsel for Service
Mark D. Miller SB#116349
SIERRA IP LAW, PC
P.O. Box 26028
Fresno, CA 93729-6028
Phone: (559) 436-3800
ipdocket@sierraiplaw.com

*Attorneys for Plaintiffs*

(SPACE BELOW FOR FILING STAMP ONLY)

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

SION CALIFORNIA, LLC, a California Limited Liability Company; BRIGHTWING, LLC, an Arizona Limited Liability Company; RONALD HELLAND, an individual; JOHN WOODS, an individual,

Plaintiffs,

v.

GROUP HOLDINGS, LLC, a South Dakota Limited Liability Company; THE ENERGY GROUP LLC, a Delaware Limited Liability Company; SUMMIT NUT COMPANY, LLC, an Arizona Limited Liability Company; NICHOLAS ARVANITAKIS, an individual; CHRISANTHOS ARVANITAKIS, an individual; and JUSTIN BALLARD, an individual,

Defendants.

Case No:

COMPLAINT FOR TRADE SECRET MISAPPROPRIATION, FRAUD AND DECEIT, CIVIL CONSPIRACY

DEMAND FOR JURY TRIAL

COME NOW Plaintiffs, SION CALIFORNIA, LLC, a California Limited Liability Company, and BRIGHTWING, LLC, an Arizona Limited Liability Company, RONALD HELLAND, an individual, and JOHN WOODS, an

individual, (collectively referred to herein as "Plaintiffs") and for their Complaint against Defendants GROUP HOLDINGS, LLC, a South Dakota Limited Liability Company; THE ENERGY GROUP LLC, a Delaware Limited Liability Company; SUMMIT NUT COMPANY, LLC, an Arizona Limited Liability Company; NICHOLAS ARVANITAKIS, an individual; CHRISANTHOS ARVANITAKIS, an individual; and JUSTIN BALLARD ("Defendants") hereby allege as follows:

## I. THE PARTIES

1. **Plaintiff Sion California, LLC** ("Sion") is a California limited liability company having its principal place of business in Fowler, California. Sion is engaged in the business of developing and manufacturing advanced technological products. Sion was created by and is owned by individual plaintiffs Ronald Helland and John Woods.

2. **Plaintiff Brightwing, LLC** ("Brightwing") is an Arizona limited liability company having its principal place of business in Scottsdale, Arizona. Brightwing is a business development company created by and owned by individual plaintiffs Ronald Helland and John Woods.

3. **Plaintiff Ronald Helland** ("Helland") is an individual and a resident of Scottsdale, Arizona. Helland is a founder and owner of plaintiffs Brightwing and Sion.

4. **Plaintiff John Woods** ("Woods") is an individual and a resident of Fresno, California. Woods is a founder and owner of plaintiffs Brightwing and Sion.

5. **Defendant Group Holdings, LLC** ("Group Holdings") is, on information and belief, a limited liability company organized under the laws of the state of South Dakota with its principal place of business in Watertown, South Dakota.

6. **Defendant THE ENERGY GROUP LLC** ("TEG") is, on

information and belief, a limited liability company organized under the laws of the state of Delaware with its principal place of business in Cochise, Arizona.

7. **Defendant SUMMIT NUT COMPANY, LLC** ("SNC") is, on information and belief, a limited liability company organized under the laws of the state of Arizona with its principal place of business in Cochise, Arizona.

8. **Defendant Nicholas Arvanitakis** is an individual who, on information and belief, resides in Arizona and is a principal, member, and/or agent of defendant Group Holdings. Nicholas On information and belief, Arvanitakis personally participated in the acts alleged herein individually and on behalf of defendant Group Holdings. On information and belief, defendant Nicholas Arvanitakis often uses the alias "Joe Wilson" in his business dealings, and is referred to hereinafter as "Joe Wilson" or "Wilson".

9. **Defendant Chrisanthos Arvanitakis** is an individual who, on information and belief, resides in Arizona and is a principal, member, and/or agent of defendant Group Holdings. On information and belief, Chrisanthos Arvanitakis personally participated in the acts alleged herein individually and on behalf of defendant Group Holdings.

10. **Defendant Justin Ballard** is an individual who, on information and belief, resides in Maine and was a principal, member, and/or agent of defendant Group Holdings at the time of the acts giving rise to claims asserted herein. On information and belief, Justin Ballard personally participated in the acts alleged herein individually and on behalf of defendant Group Holdings.

11. On information and belief, Defendants Joe Wilson, Chrisanthos Arvanitakis, and Justin Ballard (collectively, the "Individual Defendants") were acting on behalf of and for the benefit of defendant Group Holdings. All Defendants acted as co-conspirators with respect to the wrongful acts and conduct described below.

## II. JURISDICTION AND VENUE

12. **Subject Matter Jurisdiction:** This Court has original federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c). Plaintiff Sion asserts a claim under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, which creates a private cause of action for trade secret misappropriation involving a trade secret used in interstate or foreign commerce. Section 1836(c) expressly provides that "[t]he district courts of the United States shall have original jurisdiction of civil actions brought under" the DTSA. Plaintiffs offer and provide their products, which are manufactured using plaintiffs' trade secrets, to customers in multiple states, engaging in interstate commerce as an integral part of their business operations.

13. The Court has supplemental jurisdiction over the related state-law claims under 28 U.S.C. § 1367 in that the state law claims are integrally interrelated with Plaintiffs' federal claims and arise from a common nucleus of operative facts such that the administration of Plaintiffs' state law claims with their federal claims furthers the interest of judicial economy.

14. **Personal Jurisdiction:** This Court has personal jurisdiction over all Defendants because, as described herein, each of the Defendants purposefully directed activities toward California and committed tortious acts in California. In particular, Defendants, on information and belief, collectively formed and executed a plan under which Defendants Joe Wilson and Justin Ballard traveled to and entered Plaintiff Sion's facility in Fowler, California (which is within the Eastern District of California) as agents of Group Holdings, and while there engaged in intentional and willful misconduct, including without limitation surreptitiously and secretly recording Sion's manufacturing facility and processes, which is confidential and proprietary information. As a result of the planning and execution of the visit to the Fowler facility in California and engaging in conduct in California knowingly and intentionally causing injury within California,

Defendants defendants Joe Wilson, Justin Ballard, and Group Holdings have established minimum contacts with this forum and should reasonably anticipate being haled into court in this District.

15. On information and belief, defendant Chrisanthos Arvanitakis was fully aware of the plan for Wilson and Ballard to obtain access to Sion's California facility, approved or authorized that plan, and intended to receive and benefit from the resulting unauthorized acquisition of Plaintiffs' confidential information and trade secrets On information and belief, all Defendants, including Chrisanthos Arvanitakis, TEG, and SNC, were fully aware that the hydronium-production methods, equipment configurations, process parameters, and related manufacturing know-how they adopted and continue to use had been taken from Sion in California without Plaintiffs' permission, through unauthorized recording and in violation of the confidentiality obligations governing the Fowler facility visit. Notwithstanding that knowledge, Defendants intentionally received, retained, shared, implemented, and commercially exploited Plaintiffs' confidential information and trade secrets for their own benefit, knowing that their possession and use of that information were unauthorized and unlawful and would cause Plaintiffs to lose the secrecy, exclusivity, licensing value, and competitive advantage of their technology in California. TEG and SNC, acting through their members, managers, and controlling persons, including Wilson and Chrisanthos Arvanitakis, knowingly adopted and continue to use hydronium-production methods derived from the confidential information improperly acquired at Sion's California facility. Each Defendant's own participation in, authorization or ratification of, and/or knowing adoption and exploitation of the California-directed misappropriation establishes a substantial connection between that Defendant, California, and the claims asserted in this action.

16. As a result of the planning and execution of the visit to the Fowler facility in California and engaging in conduct in California knowingly and

intentionally causing injury within California and their ongoing use of Plaintiffs' misappropriated trade secrets, Defendants have established minimum contacts with this forum and should reasonably anticipate being haled into court in this District. Exercising jurisdiction over Defendants in these circumstances comports with traditional notions of fair play and substantial justice.

17. **Venue:** Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District. The Plaintiffs' facility that Defendants visited is located in this District, and the confidential information at issue was accessed and misappropriated in this District. Additionally, Plaintiff Sion's principal place of business is in this District, and the harm from Defendants' actions is being felt in this District.

## III. FACTUAL BACKGROUND

18. Plaintiffs Helland, Woods, Sion, and Brightwing bring this civil action following years of business engagement and trust-building with Defendants that culminated with the theft of Plaintiffs' trade secrets. Plaintiffs Helland and Woods are the developers of proprietary chemical formulations and related manufacturing know-how used to produce Plaintiffs' Sion-HYD and low-pH "hydronium" products, and derivative products, including acidified calcium sulfate ("ACS") (collectively, the "Plaintiffs' Trade Secrets"). Plaintiff Helland is an owner and plaintiff Woods is an owner and the principal operator of plaintiff Sion. Plaintiffs Helland and Woods are also the owners and principal operators of Plaintiff Brightwing.

19. Plaintiffs' Trade Secrets are not limited to a finished product. They include, among other things, the novel, secret, and precise methods of producing Sion-HYD, low-pH "hydronium" products, and derivative products, including, *inter alia*, magnetization processes, chemical dissociation methods, chemical

precipitation steps, and more efficient hydronium production methods compared to prior existing processes. The methods include secret inputs, process steps, equipment configurations, plant and facility design parameters, quality-control practices, and manufacturing specifications necessary to reliably and safely produce the Sion-HYD, low-pH "hydronium" products, and derivative products at commercial scale.

20. Plaintiffs expended substantial time, money, and effort developing these formulations and processes. Plaintiffs Helland and Woods began developing the formulations and processes in 2006 after evaluating existing hydronium chemistries for their potential use in agricultural applications, including breaking down natural metal salts found in the soil to mineralize calcium, sodium, zinc, and other ions. Plaintiffs began modifying and improving existing methods of producing hydronium because the Plaintiffs determined that the existing methods were inefficient. Between 2008 and 2014, Plaintiffs conceived of and tested new methods of production that simplified the production process and reduced the time required to produce hydronium. The method of production included the development of custom equipment and input chemistries through many experimental iterations. By 2017, the improved hydronium production methods had chemically improved the hydronium product by reducing adulterants and its corrosiveness resulting in the Sion-HYD product, and increased the capacity of the Plaintiffs' manufacturing facility by four times (i.e., by 300%).

21. The resulting technology and know-how confer significant competitive advantage because they enable Plaintiffs to manufacture and supply Sion-HYD, low-pH "hydronium" products, and derivative products that have unique properties of being a chemically stable, low pH composition, while not being corrosive. The improvements made by Plaintiffs allowed for applications beyond the agricultural industry. Sion's products proved to be powerful and stable antiseptics strong enough to kill bacteria while being negligibly corrosive to

human skin. These properties are attractive for multiple end markets, including consumer and personal-care applications, and heavy industries such as the agricultural industry and the petroleum and gas industry.

22. Plaintiffs have maintained the secrecy of their formulations, processes and know-how, including without limitation by limiting access to those with a legitimate need to know and by requiring contractual confidentiality protections when Plaintiffs explored commercial partnerships.

**A. Plaintiffs' Introduction to Defendants Wilson and Ballard**

23. In or around early 2019, the Plaintiffs began considering additional commercial applications of their hydronium products, including water well injections to break down mineral deposits, and disinfectant applications in the agricultural industry and consumer products, including topical disinfectants. Plaintiffs had expressed interest to business contacts about working with businesses in adjacent industries to exploit their technology in new products and applications, including Andrew Howe.

24. Plaintiffs had worked with Mr. Howe in an application of their Sion-HYD product to harvested almonds as a sanitation agent. Helland and Woods had expressed to Mr. Howe that they had an interest in expanding the applications of their products to other industries. Mr. Howe informed Defendants Wilson and Ballard of Plaintiffs' low-pH Sion-HYD product and of their interest in expanding into new applications and business opportunities. The Defendants Wilson and Ballard informed Mr. Howe that they were interested in meeting with Plaintiffs Helland and Woods. Howe coordinated a meeting between defendants Wilson and Ballard and Plaintiffs Helland and Woods at Sion's Fowler facility. The meeting at the Sion facility was conducted in Sion's administrative office. Wilson and Ballard were not granted access to the manufacturing facility at that time.

25. The initial meeting between defendants Wilson and Ballard and Plaintiffs Helland and Woods prompted further discussions between the parties regarding a potential business relationship. During these early discussions, Woods and Helland shared limited information about Plaintiffs' business, technology, and strategic plans with Wilson and Ballard. This information was provided for the limited purpose of allowing Wilson and Ballard to evaluate the prospective business relationship. It was both explicitly and implicitly understood by all parties that the information was being disclosed in confidence, that it was not publicly known, and that Wilson and Ballard were not to use or disclose it except in connection with evaluating the potential deal. Wilson and Ballard were made aware that the information was sensitive and proprietary, and Wilson and Ballard agreed to maintain the information's confidentiality.

26. In the course of these communications, Defendants, including the Individual defendants Wilson and Ballard as representatives and agents of Defendant Group Holdings, represented themselves as bona fide interested partners or investors. Defendants Wilson and Ballard marketed themselves to Helland and Woods as sophisticated operators with industry contacts and distribution capability, claiming they would help expand Plaintiffs' technology into new channels. They conveyed to Plaintiffs that they were genuinely interested in a partnership and investment in new business lines for Plaintiffs' technology. By doing so, Defendants Wilson and Ballard created the clear impression that they would respect Plaintiffs' proprietary information and the confidentiality of the information shared about their business and products. Plaintiffs relied on these representations of good faith and the accompanying expectation of confidentiality when deciding to proceed in business collaborations with Wilson and Ballard.

27. Representations by Wilson and Ballard were not limited to the initial discussions and meeting with Plaintiffs. In meetings, telephone calls, emails, and other communications in or around early 2019 and continuing through

2021, Defendants Wilson and Ballard represented to Plaintiffs Helland and Woods that they were pursuing legitimate new business opportunities for Plaintiffs' Sion-HYD and derivative products.

28. These representations were material to Plaintiffs. Plaintiffs would not have continued engaging with Defendants, disclosed non-public, commercially sensitive business information, including potential customers, pricing, supply capability, product positioning, marketing strategy, regulatory and safety issues, and potential uses in the personal-care, agricultural, oil-and-gas, and industrial markets, or later permitted Wilson and Ballard to access Sion's manufacturing facility had Plaintiffs known that Defendants intended to obtain Plaintiffs' formulation and manufacturing know-how for their own competing use.

29. Plaintiffs also spent substantial time and resources pursuing the proposed business relationship, including time spent in meetings and calls with Wilson and Ballard, evaluating commercial opportunities identified by Wilson and Ballard, and devoting management and manufacturing resources to Defendants in reliance on Defendants' representations of legitimate partnership intent.

**B. Joint Venture and Letter of Intent**

30. Plaintiff Brightwing was created by Plaintiffs Helland and Woods in 2019 for the purpose of pursuing the business opportunities discussed with Wilson and Ballard. In July 2019, Brightwing and Group Holdings executed a confidential Letter of Intent that expressly contemplated a relationship involving proprietary and trade secret technology and contemplated new entity structures and commercialization pathways. A copy of the Letter of Intent (the "LOI") is attached hereto as Exhibit A and incorporated herein by this reference. Among other things, the LOI characterized Bright Wing's contribution as intellectual

property, including trade secret information and know-how regarding a stabilized hydronium molecule, "as well as regulatory and government guidelines, rules, regulations, production techniques and costs, market prices and other data and information about Stabilized Hydronium". The reference in the LOI to "Stabilized Hydronium" refers to Sion-HYD and its derivatives.

31. The LOI also contemplated that the parties would proceed under confidentiality obligations and draft additional documentation to pursue the joint business venture, expressly stating:

> "[t]o advance the business opportunity and the development of the proposed products, both GROUP [defendant Group Holdings] and BRIGHT [Plaintiff Brightwing] will continue to conduct regular ***confidential*** discussions related to business, manufacturing, marketing claims, packaging development, market strategies, requirements and opportunities, client requirements, competing technologies, testing, government regulations and/or other business information directly related to finalizing product development". (Emphasis supplied.)

32. The LOI further specified an intent to pursue a 50/50 joint venture. The purpose of the venture was to develop and commercialize formulations and products based on intellectual property owned by each company. A joint venture ("Newco") was intended to be formed by August 31, 2019.

33. Defendants formed an entity called Black Hills Group LLC in April 2018 in Wyoming ("Black Hills"). The parties utilized Black Hills as the "Newco" described in the LOI. On March 23, 2020, defendant Group Holdings formally assigned 50% of its membership interest in Black Hills to Plaintiff Brightwing. This assignment was signed by principals of both entities, including Plaintiffs Ronald Helland and John Woods, and defendants Ballard and Wilson.

34. Defendants seized on this framework of a confidential relationship, joint venture, and contemplated licensing to create the appearance of legitimacy

and inevitability of new business opportunities and collaborations, while continuing to press Plaintiffs for disclosure of Plaintiffs' Trade Secrets, including the formulations and manufacturing processes necessary to produce Plaintiffs' products independent of Plaintiffs.

35. In parallel, Defendants through Black Hills purchased proprietary Sion chemical products under ordinary commercial terms from 2019 to mid-2021 for projects in Arizona and Texas that Defendants represented as opportunities that Defendants were developing for Black Hills, while engaged in ongoing discussions about deeper partnership opportunities. Plaintiffs' products, including low-pH hydronium products and related ACS materials, were purchased by or for Black Hills, and delivered to locations associated with Defendants' downstream operations in Arizona and Texas.

36. Defendants continued through this period to represent to Plaintiffs in meetings, telephone calls, and emails, and other communications that Defendants were pursuing legitimate new business opportunities for Plaintiffs' Sion-HYD and derivative products. Wilson and Ballard further represented that Group Holdings and Black Hills intended to pursue those opportunities jointly with Brightwing through the parties' contemplated 50/50 venture and that Brightwing would participate in and receive the benefits of the resulting commercialization.

37. On information and belief, those representations and promises were false when made. At the time Wilson and Ballard represented that they intended to carry out the identified opportunities jointly with Brightwing and requested product shipments and business support for that stated purpose, Wilson and Ballard had no intention of carrying out those plans for Brightwing's benefit or permitting Brightwing to participate in the resulting business. On information and belief, Wilson and Ballard intended to use the apparent joint venture, the requested shipments, and Brightwing's business-development efforts to learn the products' characteristics, applications, handling requirements, pricing, customer

requirements, and commercial potential, while positioning Group Holdings to pursue the resulting opportunities independently and exclude Brightwing from their benefits.

38. On information and belief, Wilson and Ballard knew that their representations concerning their intent to pursue the business opportunities jointly with Brightwing were false and intended that Brightwing rely upon them. On information and belief, the misrepresentations and requests for product shipments were planned, authorized, and approved by the members and controlling persons of Group Holdings for the purpose of obtaining products, information, business-development assistance, and commercial opportunities for Group Holdings.

39. These representations were material to Plaintiffs. Brightwing actually and reasonably relied on Wilson's and Ballard's representations by entering and continuing the proposed joint-business relationship, executing the Letter of Intent, participating in Black Hills, devoting management and business-development resources to the purported joint opportunities, coordinating and supporting shipments of Sion products, disclosing non-public, commercially sensitive business information, including pricing, supply capability, product positioning, marketing strategy, production scheduling, product applications, regulatory and safety issues, and refraining from or delaying pursuit of alternative licensing, distribution, and commercialization relationships in the personal-care, agricultural, oil-and-gas, and industrial markets. Had Brightwing known that Wilson, Ballard, and Group Holdings did not intend to carry out the represented joint-business plans or permit Brightwing to share in the resulting opportunities, Brightwing would not have disclosed the non-public information, would not have devoted its resources to those efforts, and would have pursued other available business relationships and commercialization opportunities.

40. As a direct and proximate result of that reliance, Brightwing incurred management, personnel, legal, transaction-review, product-support, and

business-development expenses and lost or delayed alternative commercial opportunities. These injuries arose from Brightwing's reliance on the false business-opportunity representations and promises and are separate from the damages caused by Defendants' later acquisition, use, and disclosure of Plaintiffs' Trade Secrets.

### C. Defendants' Escalation: "Trade Secret" Licensing Designed to Extract the Manufacturing Know-How

41. By late 2021, Defendants escalated their efforts to gain access to Plaintiffs' Trade Secrets, pressing for access to process methodology that would permit Defendants to replicate Plaintiffs' products.

42. In or around November 2021, building on this multi-year relationship, Defendants sought terms with Plaintiffs that would allow access to Plaintiffs' Trade Secrets. The Parties prepared and circulated draft license and confidentiality agreements expressly framed around "Trade Secret Information," "Know-how," and proprietary manufacturing specifications, including draft confidentiality agreements, draft exclusive license agreements, and draft personal guarantees. Copies of these draft agreements are attached hereto collectively as Exhibit B and incorporated herein by this reference. These discussions and draft exchanges were couched in assurances of honest intent and strict confidentiality.

43. During the late 2021 and early 2022 licensing discussions, Defendants renewed and amplified their prior false representations. Defendants represented that the purpose of the proposed license was to create a lawful and mutually beneficial structure under which Group Holdings or its affiliates would obtain rights only through Plaintiffs' consent and only under agreed written terms requiring payment, confidentiality, and protection of Plaintiffs' proprietary technology.

44. Those representations were false when made. On information and

belief, by the time Defendants pressed for access to Plaintiffs' manufacturing process, the Defendants had already determined that they would attempt to obtain the information necessary to replicate Plaintiffs' hydronium production system without paying the agreed license fee, without honoring the contemplated royalty structure, and without preserving Plaintiffs' control over the technology.

45. Defendants' false representations caused Plaintiffs to incur additional harm separate from the later use of the trade secrets. Plaintiffs incurred time, expense, management distraction, legal and business-review costs, facility-preparation effort, product-development effort, and opportunity costs associated with preparing for a license transaction that Defendants never intended to consummate in good faith.

46. On information and belief, Defendants never intended to honor the contemplated license framework in good faith. Instead, Defendants used the licensing posture to justify deeper knowledge of Plaintiffs' processes and to create a pretense for a manufacturing facility visit, process demonstrations, and technical know-how disclosures.

**D. Defendants' Theft of Plaintiffs' Manufacturing Process and Subsequent Breakaway**

47. In December 2021, Defendants requested a visit to Sion's manufacturing facility in Fowler, California for the limited purpose of evaluating the production process in pursuit of licensing Plaintiffs' Trade Secrets. The visit was arranged as part of Defendants' supposed due diligence in evaluating the potential licensing arrangement. Prior to the tour, Defendants Wilson and Ballard were informed that all information observed during the tour was confidential. Sion's representatives communicated and Wilson and Ballard understood that the facility housed trade secrets and proprietary equipment and processes, and that Wilson and Ballard were being given limited access solely for the purpose of

evaluating the prospective business relationship under strict confidentiality, and that they were not to use any information or know-how learned during the tour for any other purpose.

48. Relying on Defendants' representations and the confidential nature of the business relationship, Plaintiffs consented to grant Wilson and Ballard the requested access to Sion's manufacturing facility under the guidance and oversight of Helland and Woods. Without Plaintiffs' knowledge or consent, during this visit, and in direct violation of the Defendants' understanding that Sion's manufacturing methods were confidential, Wilson and Ballard surreptitiously and secretly recorded trade secrets and proprietary business information, later exploiting that information for their own commercial advantage.

49. On information and belief, the information and footage Defendants collected included detailed visuals of Sion's manufacturing process, including close-ups of specialized machinery and components, demonstrations of Sion's proprietary chemical processes in operation, and discussions of technical know-how. These highly confidential details are integral to Plaintiffs' competitive position, are not known to the public or to competitors, and possess substantial independent economic value precisely because of their secrecy and the difficulty of lawful, independent acquisition. Defendants misappropriated Plaintiffs' manufacturing processes through covert and improper means, including under the pretense of partnership and licensing discussions and by exploiting access gained through joint commercialization activities, without Plaintiffs' knowledge or consent and in violation of the parties' confidentiality duties and the trust underpinning the relationship.

50. At no time did Plaintiffs authorize Wilson and Ballard to record or retain any images, videos, or other reproductions of Sion's facility or information. Defendants' actions were in direct violation of Sion's confidentiality agreement

and the understanding between the parties. Defendants thereby acquired knowledge of Plaintiffs' Trade Secrets through misappropriation and deception.

51. After securing the information needed to replicate Plaintiffs' products, Wilson, Ballard, and Group Holdings intentionally concealed the unauthorized recording, their true reason for requesting access, and their use of the information obtained from Sion. Although they knew Plaintiffs continued to believe that the licensing discussions and business relationship had merely stalled for ordinary commercial reasons, Wilson, Ballard, and Group Holdings did not disclose that the facility visit had been used to record Plaintiffs' manufacturing process or that the information was being used to develop competing production capabilities. Their duty to disclose arose from the confidential business and licensing relationship they had cultivated, their false representations concerning the purpose and permissible scope of the visit, and their exclusive knowledge that those representations had been false. This concealment delayed Plaintiffs' discovery of the misconduct and prevented Plaintiffs from promptly demanding return of the recording, preserving evidence, seeking injunctive relief, or pursuing alternative commercial opportunities.

52. On information and belief, Defendants' conduct was not accidental or opportunistic. Defendants' conduct reflected a pattern consistent with a predatory "access-and-extract" scheme. It followed a coherent pattern: (a) cultivate a relationship, (b) gain trust and access, (c) press for deeper disclosure under confidentiality and licensing pretexts, (d) extract the formulation and manufacturing information, and (e) break away to utilize Plaintiffs' Trade Secrets in competition with Plaintiffs and take the contemplated joint venture business opportunities for themselves.

## E. Plaintiffs Were Informed of the Misappropriation at a Later Date

53. Plaintiffs were not aware of the Defendants' covert misappropriation

of Plaintiffs' Trade Secrets at the time of the visit. Defendants phased out their communications and interactions with Plaintiffs over a few months after the visit to Sion's facility. Plaintiffs were confused and disappointed as the communications and business interactions with Plaintiffs waned. Plaintiffs did not understand the reasons why the relationship ceased.

54. Defendants continued to conceal the unauthorized recording and their use of Plaintiffs' trade secrets to produce their own hydronium production systems and products. Instead, Defendants allowed Plaintiffs to believe that the relationship had merely slowed, stalled, or failed for ordinary business reasons. Defendants' concealment delayed Plaintiffs' discovery of the misappropriation and prevented Plaintiffs from seeking injunctive relief, demanding return of confidential materials, preserving evidence, or investigating competing production activity.

55. Defendants' concealment was intentional. Defendants knew that disclosure of the recording and competing production efforts would expose them to legal action, including demands for return of materials, emergency injunctive relief, and claims for damages. Defendants therefore concealed their conduct to preserve the benefit of the fraudulently obtained access and to continue developing or commercializing hydronium products without Plaintiffs' knowledge.

56. Despite Defendants' concealment, on or about September 4, 2024, a person working with Defendants ("the Informant") informed Woods that an unauthorized video recording of Plaintiffs' Fowler, California facility had been taken by Wilson and Ballard. The Informant told Woods that Defendants were using technology that they had not themselves developed to produce low-pH hydronium products. The Informant also told Woods that Plaintiffs' proprietary manufacturing information had been captured in the unauthorized video recording of Plaintiffs' Fowler, California facility and that Defendants subsequently used

that information to develop new production facilities operated by Defendants.

57. Plaintiffs were told by the Informant that they had worked for an entity believed to be a Delaware limited liability company registered as The Energy Group LLC ("TEG") controlled by Joe Wilson and Chrisanthos Arvanitakis. The Informant conducted research and development of hydronium chemistry for use in connection with power generation and other applications on the premises of the Summit Nut Company, LLC ("SNC") in Cochise, Arizona. The Informant used specialized equipment with specific chamber and magnet configurations and other design parameters in the production of hydronium SNC's facility. The Informant was provided with information regarding hydronium production processes by Joe Wilson and Chrisanthos Arvanitakis. However, according to the Informant, it became apparent to the Informant through interactions with Wilson and Arvanitakis that they did not understand the hydronium chemistry that they presented to the Informant.

58. The Informant also had concerns regarding technical representations being made to potential customers of TEG that would result in safety risks to the customers. The lack of expertise exhibited by Wilson and Arvanitakis and the failure to observe proper safety standards for TEG's offered products caused the Informant to send out a company-wide email regarding safety concerns in June 2024. During this timeframe, the Informant learned from another person working with the Defendants of the unauthorized video taken by Wilson and Ballard of Sion's facility in December 2021.

59. The Informant subsequently reached out to Plaintiffs on or about September 4, 2024, and informed them of the unauthorized video and the research and development of hydronium products that the Informant was asked to work on for TEG using Plaintiffs' Trade Secrets. The Informant also informed Plaintiffs that the specialized equipment that the Informant utilized on SNC's premises looked just like Sion's manufacturing equipment the Informant saw in the

unauthorized video.

60. A demand letter was sent to each of Defendants Joe Wilson, Chrisanthos Arvanitakis, and Justin Ballard on June 9, 2025, informing them that Plaintiffs had learned of Defendants' misappropriation and making specific demands that Defendants cease all use and disclosure of Plaintiffs' Trade Secrets, among other demands, which is attached hereto as Exhibit C and incorporated herein by this reference. Through its attorneys, Group Holdings provided a response to the letter on June 30, 2025, denying the alleged claims. A copy of the Group Holdings response letter is attached hereto as Exhibit D and incorporated herein by this reference.

**F. Joe Wilson, Chrisanthos Arvanitakis, and Justin Ballard: Control, Participation, and Benefit From the Misappropriation**

61. Defendants Joe Wilson, Chrisanthos Arvanitakis, and Justin Ballard were not passive bystanders. On information and belief, they were principals, owners, managers, and controlling persons behind one or more of the defendant entities and other entities involved in the unauthorized use of Plaintiffs' Trade Secrets, including Group Holdings, TEG, and affiliated operations.

62. Joe Wilson, Chrisanthos Arvanitakis, and Justin Ballard participated in, directed, and benefited from the misappropriation and misuse of Plaintiffs' Trade Secrets, including by helping structure and operate the purported business entity and investment framework used to obtain Plaintiffs' Trade Secrets, participating in the unlawful misappropriation of Plaintiffs' Trade Secrets from Sion's facility, and in exploiting Plaintiffs' Trade Secrets to commercialize competing offerings.

63. Defendants' predatory intent is further demonstrated by their deliberate use of multiple overlapping entities, including defendant Group Holdings as well as an entity known as Black Hills Group LLC, with the intent to

transact, to shift and obscure ownership and control, and attempt to insulate individual actors, including defendants Joe Wilson and Chrisanthos Arvanitakis, from liability, while exploiting Plaintiffs' confidential technology. On information and belief, Defendants are currently producing and selling low-pH hydronium products and derivatives of low-pH hydronium using Plaintiffs' trade secrets through multiple entities controlled by individual Defendants, including Group Holdings, TEG, and SNC.

64. On information and belief, Wilson and Chrisanthos are members, managers, and controlling persons of TEG and SNC and exercise control over those entities' hydronium research, development, manufacturing, and commercialization activities. Wilson and Chrisanthos used that control to cause TEG and SNC to receive Plaintiffs' confidential manufacturing information and information derived from the unauthorized recording of Sion's California facility.

65. On information and belief, TEG and SNC knew or had reason to know that the manufacturing information provided by Wilson and Chrisanthos originated from Sion, had been obtained during Wilson's and Ballard's visit to Sion's California facility, and had been acquired without Plaintiffs' authorization and in violation of the confidentiality limitations governing the visit. Notwithstanding that knowledge, TEG and SNC knowingly incorporated the misappropriated information into the design, configuration, construction, operation, and refinement of hydronium-production equipment and processes used at SNC's Cochise, Arizona facility.

66. On information and belief, TEG and SNC have used and continue to use Plaintiffs' Trade Secrets to conduct research and development, manufacture hydronium products, develop proposed commercial applications, market products and processes to potential customers, and obtain commercial and competitive benefits unavailable to them through lawful means. Their continuing use is intentional and undertaken with knowledge that the information was acquired

through improper conduct committed at Plaintiffs' California facility and that such use deprives Plaintiffs of the secrecy, exclusivity, licensing value, and competitive advantage associated with Plaintiffs' Trade Secrets.

67. On information and belief, Defendants used layered entities and shifting control designed to (i) obscure who truly controlled and benefited from the scheme, and (ii) complicate Plaintiffs' ability to trace misappropriation and recover damages.

**G. Ongoing Misuse, Irreparable Harm, and Need for Injunctive Relief**

68. Plaintiffs' Trade Secrets constitute valuable proprietary information, including inputs, process steps, equipment configurations, plant and facility design parameters, quality-control practices, manufacturing specifications, operational methods, and other confidential business information. These trade secrets and confidential know-how derive independent economic value from not being generally known to the public or to Plaintiffs' competitors. Defendants have gained an unfair economic advantage by their misappropriation of Plaintiffs' Trade Secrets. Plaintiffs' ongoing business and competitive success depends on the advantage provided by Plaintiffs' Trade Secrets which are closely guarded by Plaintiffs. The secrecy of this information is therefore critical to Plaintiffs' success and competitive standing.

69. On information and belief, Defendants acted in concert pursuant to a common plan to misappropriate Plaintiffs' Trade Secrets. The Defendants intentionally coordinated their efforts to seek undetected acquisition of Plaintiffs' Trade Secrets. On information and belief, Defendants' true intent in approaching Plaintiffs was not to invest in or partner with Plaintiffs in good faith, but was instead designed to deceive Plaintiffs and misappropriate Plaintiffs' proprietary information for Defendants' own advantage.

70. On information and belief, Defendants' conduct was willful,

malicious, and conducted with conscious disregard of Plaintiffs' rights. Defendants' misrepresentations to gain access, and their covert capture and misappropriation of Plaintiffs' Trade Secrets, demonstrate a level of deceit and intent to injure Plaintiffs that was oppressive, fraudulent, and malicious.

71. As a direct consequence of Defendants' actions, Plaintiffs have suffered and continue to suffer significant harm. Plaintiffs' Trade Secrets have been compromised, putting Plaintiffs at risk of losing the competitive advantage and exclusive benefit of years of innovation, investment, and confidentiality practices. The value of Plaintiffs' confidential information is diminished by Defendants' unauthorized possession and use thereof. Moreover, Defendants led Plaintiffs down a path toward a supposed joint venture with no intention to follow through, thereby wasting Plaintiffs' time, energy, and investment in supposed joint venture. Defendants are also now competing with Sion in the marketplace using Plaintiffs' Trade Secrets, diminishing the success and value of Sion. Plaintiffs have also incurred out-of-pocket expenses in investigating the misappropriation, lost business opportunities, and have incurred other damages in an amount to be proven at trial.

72. Defendants' wrongful possession, use, and potential disclosure of Plaintiffs' Trade Secrets pose a continuing threat of irreparable injury. If Defendants are not enjoined, they may further disclose, transfer, or utilize Plaintiffs' Trade Secrets, causing incalculable and permanent harm. Plaintiffs have no adequate remedy at law for this threatened harm because once confidential information is disseminated or used by competitors, it cannot be made secret again, and monetary damages alone would not suffice to make Plaintiffs whole. Accordingly, injunctive relief is necessary to prevent Defendants from benefitting from their wrongful acts and to prevent further injury to Plaintiffs.

73. Plaintiffs now seek legal and equitable relief to remedy Defendants' misappropriation of trade secrets, fraud, and civil conspiracy. This action seeks

compensation for substantial business harm, loss of proprietary advantage, and to prevent further misuse of confidential information gained through Defendants' calculated misconduct.

## IV. PLAINTIFFS' CLAIMS

### COUNT 1
### MISAPPROPRIATION OF TRADE SECRETS
### (DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836)

74. Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 73 above as if fully set forth herein.

75. The information that Defendants obtained from Sion without Plaintiffs' knowledge or consent, as described above, includes trade secrets within the meaning of the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1839(3). These trade secrets consist of formulas, designs, methods, techniques, processes, and other business or technical information that (a) Plaintiffs have taken reasonable measures to keep secret, and (b) derive independent economic value from not being generally known to, or readily ascertainable through proper means by, another person who could obtain economic value from their disclosure or use. Plaintiffs' Trade Secrets are used in products provided to customers, including Black Hills and SNC by Sion in interstate commerce as required under 18 U.S.C. § 1836(b)(1).

76. Plaintiffs are owners and rightful possessors of the trade secret information at issue. Plaintiffs' ownership and control of this information gives them the right to exclusive use and the right to maintain the information's secrecy.

77. Wilson and Ballard misappropriated Plaintiffs' Trade Secrets by acquiring them through improper means. Acting as authorized agents of Group Holdings, Wilson and Ballard obtained access to Sion's Fowler facility under the

pretense of evaluating a license and used deception to acquire protected technical and business information without Plaintiffs' knowledge or consent. Group Holdings is responsible for that acquisition because its members planned and authorized the conduct, Wilson and Ballard acted within the scope of their authority and for Group Holdings' benefit, and Group Holdings accepted and ratified the conduct by retaining and using the information obtained. Specifically, in or around December 2021, Defendants, after obtaining access to Sion's Fowler facility, surreptitiously recorded video and images of Sion's manufacturing facility and processes using an electronic device in order to acquire protected technical and business information without Plaintiffs' knowledge or consent, in direct violation of a clear requirement of confidentiality and Plaintiffs' oral instructions.

78. On information and belief, Chrisanthos, TEG, and SNC misappropriated Plaintiffs' Trade Secrets by knowingly receiving, using, and disclosing information derived from Wilson's and Ballard's improper acquisition. When they received and used the information, Chrisanthos, TEG, and SNC knew or had reason to know that the information had been obtained through unauthorized recording of Sion's California facility and had been communicated by persons who had acquired it through improper means and who were subject to duties limiting its use and disclosure. Chrisanthos, TEG, and SNC nevertheless used the information for their own research, production, product-development, marketing, and commercial benefit without Plaintiffs' consent.

79. Defendants misappropriated Plaintiffs' Trade Secrets by acquiring them through acts of deception, in violation of 18 U.S.C. § 1836(b). At the time of acquisition and use, Defendants knew or had reason to know that they had obtained the information by improper means and under circumstances giving rise to a duty to maintain its secrecy. Defendants have no consent, authorization, or privilege to possess or use Plaintiffs' Trade Secrets in the manner that they have.

80. On information and belief, Defendants have used and disclosed Plaintiffs' Trade Secret information without Plaintiffs' consent, including by sharing it among themselves and taking steps toward using it in their own business operations. Any such use or disclosure also constitutes misappropriation under 18 U.S.C. § 1839(5). Defendants' wrongful acts have allowed them to obtain the benefit of Sion's proprietary information for their own gain and to the detriment of Plaintiffs. Defendants' misappropriation of Plaintiffs' Trade Secrets was willful and malicious. Defendants acted in conscious disregard of Plaintiffs' rights, knowing that their conduct was wrongful.

81. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and, unless Defendants are enjoined, will continue to suffer immediate and irreparable harm for which there is no adequate remedy at law. Pursuant to 18 U.S.C. § 1836(b)(3)(A), Plaintiffs are entitled to an injunction, including, but not limited to, an order prohibiting Defendants from using or disclosing Plaintiffs' Trade Secrets information and requiring Defendants to return to Plaintiffs (or destroy) all trade secret or confidential materials and information they wrongfully obtained.

82. As a further direct and proximate result of Defendants' misappropriation, Plaintiffs have suffered damages in an amount to be determined at trial. Under 18 U.S.C. § 1836(b)(3)(B), Plaintiffs are entitled to recover damages for actual loss caused by the misappropriation, as well as damages for any unjust enrichment enjoyed by Defendants that is not taken into account in computing actual loss, or, in the alternative, a reasonable royalty for Defendants' unauthorized use of Plaintiffs' Trade Secrets.

83. Because Defendants' misappropriation was willful and malicious, Sion is seeking an award of exemplary damages under the DTSA, up to two times the amount of the compensatory damages awarded. Plaintiffs are also seeking to recover their attorneys' fees under 18 U.S.C. § 1836(b)(3)(D), because

Defendants acted willfully and maliciously in misappropriating Plaintiffs' Trade Secrets.

**COUNT 2**

**MISAPPROPRIATION OF TRADE SECRETS**

**(CALIFORNIA UNIFORM TRADE SECRETS ACT, CAL. CIV. CODE § 3426 et seq.)**

84. Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 83 above as if fully set forth herein.

85. The confidential business and technical information described above constitutes "trade secrets" as defined by California Civil Code § 3426.1(d). Plaintiffs' Trade Secrets derive independent economic value from not being generally known to the public or to other persons who could obtain economic value from its disclosure or use, and they are the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Plaintiffs have invested substantial resources in developing this information and have implemented measures to safeguard it, as detailed in Section III above, the Factual Background.

86. The respective conduct of the Defendants constitutes misappropriation under California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426 et seq. Wilson and Ballard acquired Plaintiffs' Trade Secrets through improper means while acting as authorized agents of Group Holdings; Group Holdings planned, authorized, accepted, ratified, and benefited from that acquisition; and Chrisanthos, TEG, and SNC subsequently received, used, and disclosed information while knowing or having reason to know that it was derived from persons who had used improper means to acquire it and who owed duties to Plaintiffs to maintain its secrecy and limit its use.

87. Defendants wrongfully acquired Plaintiffs' Trade Secrets through

improper means, including misrepresentation and breach of a duty to maintain secrecy. Defendants knew or had reason to know that the information they acquired from Plaintiffs was proprietary and that they had obtained it by improper means and under circumstances requiring them to maintain its confidentiality. Defendants were aware or should have been aware that the information they obtained from Plaintiffs was confidential and that they were obligated to keep it secret and not use it for any purpose other than the evaluation of a business relationship with Plaintiffs. Additionally, to the extent Defendants have used or disclosed Plaintiffs' Trade Secrets without consent, such use or disclosure was and is wrongful and unauthorized, further constituting misappropriation under CUTSA.

88. As a result of Defendants' misappropriation, Plaintiffs have suffered and will continue to suffer irreparable harm and damages. Pursuant to California Civil Code § 3426.2(a), Plaintiffs are entitled to an injunction against Defendants, inlcuding, but not limited to, prohibiting Defendants from using or disclosing Plaintiffs' Trade Secrets and confidential information; and ordering Defendants to return to Plaintiffs or destroy all materials and information in their possession, custody, or control that contain or derive from Plaintiffs' Trade Secrets.

89. Pursuant to California Civil Code § 3426.3, Plaintiffs are entitled to recover damages for the misappropriation of Plaintiffs' Trade Secrets. These damages include Plaintiffs' actual losses and Defendants' unjust enrichment, in an amount to be proven at trial. If neither actual loss nor unjust enrichment can be fully proven, Plaintiffs are entitled to a reasonable royalty for Defendants' unauthorized use of Plaintiffs' Trade Secrets.

90. Defendants' misappropriation was willful and malicious, triggering the remedies in Civil Code §§ 3426.3(c) and 3426.4. Specifically, because Defendants acted willfully and maliciously, Plaintiffs are seeking an award of exemplary damages under § 3426.3(c) in an amount up to twice the award of

compensatory damages. Furthermore, Plaintiffs are seeking to recover their reasonable attorneys' fees and costs pursuant to Civil Code § 3426.4, because Defendants' misappropriation was willful and malicious.

## COUNT 3

## FRAUD AND DECEIT

91. Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 90 above as if fully set forth herein. This claim is asserted against Defendants Group Holdings, Joe Wilson, and Justin Ballard.

92. From early 2019 through mid-2021, Wilson and Ballard, individually and as authorized members and agents of Group Holdings, falsely represented to Plaintiffs through meetings, telephone calls, and emails that Group Holdings intended to pursue identified business opportunities jointly with Brightwing and that requested shipments of hydronium, ACS, and related products would be used to advance those joint opportunities. Wilson and Ballard promised that Brightwing would participate in and benefit from the resulting customers, applications, revenues, and commercial relationships. At the time they made those representations and promises, Wilson and Ballard had no intention of carrying out the represented plans for Brightwing's benefit or of allowing Plaintiffs to participate in the resulting business.

93. Defendants represented to Plaintiffs that they were interested in a legitimate investment or partnership with Plaintiffs. They implied that any information shared would be used only for evaluating the potential relationship and would be kept confidential, as evidenced by their agreement to the conditions set by Plaintiffs.

94. In late-2021, through intentionally false representations and promises, Wilson and Ballard induced Plaintiffs to allow them access to Sion's facility. Wilson and Ballard falsely represented to Sion and Brightwing that they

sought access to Sion's Fowler manufacturing facility solely to evaluate Sion's quality control and the feasibility of a proposed licensing agreement and that any information observed during the visit would remain confidential and would not be used outside the proposed licensing transaction. At the time those representations were made, Wilson and Ballard intended to use the requested access to obtain Plaintiffs' manufacturing information without authorization. After Sion relied on those representations and permitted the limited facility visit, Wilson and Ballard secretly recorded Sion's manufacturing equipment and processes.

95. Wilson and Ballard knew that the foregoing representations and promises were false, intended that Brightwing and Sion rely upon them, and concealed their contrary intent because they knew Plaintiffs would not otherwise have supplied continued products and business support or permitted access to the manufacturing facility. On information and belief, Group Holdings' members and controlling persons planned, authorized, and approved the misrepresentations, product requests, and facility-access strategy for Group Holdings' benefit. Wilson and Ballard acted within the scope of their authority as Group Holdings' members and agents, and Group Holdings ratified their conduct by accepting and using the products, information, business opportunities, and manufacturing information obtained through the fraud.

96. Defendants made the aforementioned misrepresentations and omissions with the intent to induce Plaintiffs' reliance. Defendants specifically intended that Plaintiffs would continue to share valuable information and that Plaintiffs would permit Defendants to enter the facility and learn about Sion's operations, all under false pretenses. Defendants' deceptive assurances were crafted to lull Plaintiffs into a false sense of security so that Defendants could gain the access they needed to carry out their scheme. Defendants induced Plaintiffs to continue the business relationship, share confidential and commercially sensitive information, continue supplying product and business support, and

ultimately allow Defendants access to Sion's manufacturing facility.

97. Brightwing and Sion actually and reasonably relied upon the business-opportunity representations by devoting business-development resources to the purported joint venture, providing commercial information, coordinating shipments, and delaying or foregoing alternative licensing, distribution, and commercialization opportunities. Sion and Brightwing actually and reasonably relied upon Defendants' representations and permitted Wilson and Ballard to enter Sion's confidential manufacturing facility for the limited purpose of evaluating the proposed license. Plaintiffs would not have taken those actions had they known Defendants' true intentions.

98. As a direct and proximate result of Defendants' false representations and concealment of information, Plaintiffs suffered transaction expenses, management and personnel costs, lost or delayed alternative business opportunities, and other reliance damages independent of the subsequent trade-secret use. As a direct result of being deceived, Plaintiffs exposed their valuable confidential business and trade secret information to Defendants, and wasted time and resources in pursuing a putative business relationship with Defendants. Plaintiffs have suffered general and special damages in an amount to be proven at trial, including but not limited to the economic losses associated with the misappropriation of Plaintiffs' Trade Secrets.

99. Defendants' conduct was fraudulent, oppressive, and malicious. They engaged in a deliberate fraud, tricking Plaintiffs for personal gain and with willful disregard of Plaintiffs' rights. Such egregious conduct entitles Plaintiffs to an award of punitive damages under California Civil Code § 3294. Plaintiffs accordingly seek punitive damages in an amount sufficient to punish Defendants and deter such misconduct in the future.

## COUNT 4

## CIVIL CONSPIRACY

100. Plaintiffs re-allege and incorporate by reference the allegations of paragraphs 1 through 99 above as if fully set forth herein.

101. In the months prior to December 2021, Defendants knowingly and voluntarily combined, conspired, and agreed among themselves to engage in the wrongful conduct described in this Complaint. At some time prior to or during the events in question, Defendants formed a common plan or design to misappropriate Plaintiffs' trade secrets and confidential information, to breach the confidence extended to them, and to defraud Plaintiffs. This agreement between the Defendants can be inferred from their concerted actions, the communications and coordination among them, and the very nature of the acts done, which required cooperation and planning by multiple actors.

102. In furtherance of the conspiracy, Defendants each committed overt wrongful acts. These acts include, inter alia: (a) devising a plan to obtain access to Sion's facility under false pretenses in December 2021; (b) representing to Plaintiffs their supposed interest in joint business venture and licensing trade secrets while intending to misappropriate trade secret information; (c) secretly recording video and audio of a visit to Sion's manufacturing facility; and (d) sharing the illicitly obtained information among themselves and utilizing the information for their joint commercial benefit. On information and belief, each Defendant was aware of the scheme, agreed to all acts necessary to effectuate it, and worked in concert toward their unlawful goal.

103. The unlawful acts described in this Complaint, including misappropriation of trade secrets, fraud, and civil conspiracy, were committed by one or more of the Defendants in furtherance of the conspiracy. All Defendants are jointly and severally liable for these acts and the resulting harm under the doctrine of civil conspiracy. Even if a particular Defendant did not personally carry out a specific wrongful act, that Defendant is legally responsible for the act

because it was done by a co-conspirator pursuant to their common agreement. Each Defendant, by conspiring and agreeing to the common plan, adopted and endorsed the actions of every other co-conspirator taken in furtherance of the conspiracy, and thus incurs liability equal to that of the direct perpetrators.

104. As a direct and proximate result of the aforementioned conspiracy and the wrongful acts committed pursuant to it, Plaintiffs have suffered the damages described in this Complaint. The conspiracy was the mechanism by which Defendants were able to inflict harm on Plaintiffs. By combining their efforts, Defendants succeeded in perpetrating the deception and theft that caused Plaintiffs' injuries. Each Defendant is accordingly liable for all damages ensuing from the wrongs that were the object of the conspiracy, regardless of that Defendant's degree of participation or which Defendant directly performed the act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment in their favor and against Defendants, jointly and severally, as follows:

1. For preliminary and permanent injunctive relief prohibiting Defendants, their agents, employees, and all persons acting in concert with them, from using, disclosing, or transmitting any trade secret or confidential information misappropriated from Plaintiffs. This includes an order requiring Defendants to immediately return to Plaintiffs or destroy all such trade secret or confidential materials in their possession, custody, or control, and to certify under oath their compliance with this directive. The injunctive relief should further enjoin Defendants from engaging in any unfair business practices stemming from the misappropriated information, and impose any additional restrictions necessary to prevent the irreparable harm threatened by Defendants' conduct.

2. For an award of compensatory damages in an amount to be proven at trial, including but not limited to: the actual losses suffered by Plaintiffs as a result of Defendants' wrongful conduct; and any unjust enrichment or gains improperly obtained by Defendants to the extent not accounted for in Plaintiffs' actual losses. In the alternative, with respect to the misappropriated trade secrets, Plaintiffs seek a reasonable royalty to compensate for Defendants' unauthorized use of Plaintiffs' proprietary information, as permitted under applicable law.
3. For an award of exemplary damages under the Defend Trade Secrets Act and California Uniform Trade Secrets Act, in an amount not more than twice the compensatory damages, due to Defendants' willful and malicious misappropriation of trade secrets. Additionally, for an award of punitive damages under California Civil Code § 3294 and any other applicable authority to punish Defendants for their fraudulent, malicious, and oppressive conduct including fraud and breach of confidence and to deter such conduct in the future, in an amount appropriate to the proof at trial.
4. For an order requiring Defendants to disgorge all ill-gotten gains, profits, and benefits that they have obtained as a result of their trade secret misappropriation and unfair competition and wrongful conduct, and to restore such gains to Plaintiffs.
5. For an award of reasonable attorneys' fees and expenses incurred by Plaintiffs in this action, to the extent provided by law. This includes, but is not limited to, attorneys' fees under 18 U.S.C. § 1836(b)(3)(D) and Cal. Civ. Code § 3426.4 for willful and malicious misappropriation of trade secrets, as well as any other statute, contract, or equitable doctrine that may authorize an award of fees in favor of Plaintiffs.
6. For an award of costs of suit incurred by Plaintiffs, including but not limited to filing fees, service fees, witness fees, and the costs of discovery and

investigation, as permitted by law.

7. For an award of pre-judgment interest and post-judgment interest at the maximum rate allowed by law on all applicable amounts, from the due date of each such amount until paid in full, to compensate Plaintiffs for the loss of use of monies due and owing.
8. For such other and further relief as the Court deems just and proper, including but not limited to any equitable relief (such as constructive trust or other measures) necessary to achieve fairness and to deprive Defendants of the benefits of their wrongful conduct.

Dated: August 28, 2026

SIERRA IP LAW, PC
A Professional Corporation

By /s/*William K. Nelson*
William K. Nelson
Attorneys for Plaintiffs,

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment to the Constitution of the United States, Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: August 28, 2026

SIERRA IP LAW, PC
A Professional Corporation

By /s/*William K. Nelson*
William K. Nelson
Attorneys for Plaintiffs,